STATE OF MAINE *vs* BOSTON AND MAINE RAILROAD COMPANY.

York.     Opinion June 19, 1888.

*Railroads. Crossings. Negligence. Contributory negligence.*

The rule which requires that a traveler on the highway shall look and listen before he attempts to drive across a railroad track, also as imperatively requires that, if a coming train is heard by him, and there be doubt whether the train is upon such track or some other, he shall stop at a safe distance from the crossing until all doubt is solved as to its location, unless deceived by surrounding circumstances, and without his fault.

The deceased in this case, with two associates, was riding in a wagon towards a railroad crossing, at about ten o'clock in the evening of a starlight night, one of the associates owning and driving the team, and carrying the other two gratuitously as a neighborly kindness, when a locomotive whistle was heard by them. They expressed doubt among themselves whether the train was on the road they were to cross, or on another road farther away running in the same direction, and continued driving on slowly, intent upon the noise of the train. They could not see the train on account of buildings and bushes between them and it. The bell was not heard by them. As they approached nearer, they saw the gates at the crossing wide open and no person in attendance upon them, although they had been accustomed to seeing the gates in operation and a flagman there. For several years the practice of the road had been to keep a flagman in attendance at the crossing, but, unknown to these persons he usually left the place at about seven in the evening for the night. The train was the night Pullman from Boston going east, which for most of the time for many years had not run upon this road, but had run upon the other road of the same company before spoken of. The train was running through a compact portion of the city of Biddeford at an unlawful rate of speed for such a place, and at the rate of twenty-five miles an hour, or more, when the collision occurred and the person for whose death this suit

is brought was instantly killed.  It is stipulated by the parties that the plaintiff shall recover if these facts would in any event authorize a jury to find a verdict in favor of the plaintiff.

*Held :* That a verdict for the plaintiff might be upheld.

The defendants cannot escape liability, upon the ground that no statute required them to maintain gates at the crossing.  The voluntary establishment of gates is evidence of their necessity and, being advertised to travellers, it is evidence of negligence if they are not properly attended and maintained.

Less responsibility may have rested on the two persons who were passengers than on the driver who owned and drove the team.  The doctrine of the English case of *Thorogood* v. *Bryan*, which imputes to a passenger the negligence of a driver over whom the passenger exercises no influence or control, as far as it has obtained a footing in this State, is overruled.

ON report.

An indictment under the statute for the alleged negligent killing of William R. Benjamin, of Biddeford, in a collision at the Main street crossing in Biddeford, in the evening of November 26, 1886.

The facts are stated in the opinion.

*H. H. Burbank*, county attorney, for the state.

No bell was rung as required by Revised Statutes, c. 51, § 33.

This was negligence *per se.  Webb* v. *P. & K. Railroad*, 57 Maine, 134; *Whitney* v. *M. C. Railroad*, 69 Maine, 210; *Plummer* v. *E. Railroad*, 73 Maine, 593; *Commonwealth* v. *B. & W. Railroad*, 101 Mass. 202; *Sonier* v. *B. & A. Railroad*, 141 Mass. 10; *Renwick* v. *N. Y. C. Railroad*, 36 N. Y. 132; *Smedis* v. *B. & R. B. Railroad*, 88 N. Y. 13; *G. & C. U. Railroad* v. *Loomis*, 13 Ill. 548; *St. L. J. & C. Railroad* v. *Terhune*, 50 Ill. 151; *P. P. & J. Railroad* v. *Siltman*, 88 Ill. 579, or 21 Am. & Eng. Ry. Rep. 532; *Ernst* v. *Hud. Riv. Railroad*, 32 Barb. 159.

No flagman or gate was maintained at this crossing, as required by Revised Statutes, c. 51, § 75, as amended by c. 377 of the Public Laws of 1885.

This was negligence *per se.*  (See cases above cited.)  *Shaw* v. *B. & W. Railroad*, 8 Gray, 59; *Norton* v. *E. Railroad Co.* 113 Mass. 366; *Prescott* v. *Same, Id.* 370; *Pollock* v. *Same*, 124 Mass. 158; *Eaton* v. *Fitchburg Railroad*, 129 Mass. 364; *Commonwealth* v. *B. & M. Railroad*, 133 Mass. 384; *Tyler*

v. *N. Y. & N. E. Railroad*, 137 Mass. 243; *Lesan* v. *M. C. Railroad*, 77 Maine, 89; *State* v. *Same*, *1 d.* 545; *Kissenger* v. *N. Y. & H. Railroad*, 56 N. Y. 539; *Dolan* v. *Del. & Hud. Railroad*, 71 N. Y. 285; *Kan. Pac. Railroad* v. *Richardson*, 6 Am. & Eng. R. R. Cas. 96; *Welsch* v. *H. & St. Jo. Railroad*, *1 d.* 455; *Same* v. *Same*, *1 d.* 78; *Kinney* v. *Crocker*, 18 Wis. 82; *Butler* v. *M. & St. P. Railroad*, 28 Wis. 487; Patterson's "Railway Accident Law," p. 163.

The negligence of the corporation caused the death of Benjamin. *R. R.I. & St. L. Railroad* v. *Lewis*, 58 Ill. 49; *Dimick* v. *C. and N. W. Railroad*, 80 Ill, 341; *Trow* v. *Vt. Cen. Railroad*, 24 Vt. 495; Shear. & Red. on Neg. § 33.

These travelers were "in the exercise of due care and diligence." *Fletcher* v. *B. and M. Railroad*, 1 Allen, 15; *Cunningham* v. *Hall*, 4 Allen, 276; *Gaynor* v. *O. C. and N. Railroad*, 100 Mass. 212; *Eagan* v. *Fitchburg Railroad*, 101 Mass. 317; *Chaffee* v. *B. & L. Railroad*, 104 Mass. 115; *Williams* v. *Grealy*, 112 Mass. 81; *Treat* v. *B. & L. Railroad*, 131 Mass. 372; *Tyler* v. *N. Y. & N. E. Railroad*, 137 Mass. 241.

And our court has recognized the force of these cases; *Whitney* v. *M. C. Railroad*, 69 Maine, 211; *O'Brien* v. *McGlinchy*, 68 Maine, 556; *Shannon* v. *B. & A. Railroad*, 78 Maine, 59; *Beers* v. *Hous. Railroad*, 19 Conn. 566; *Ernst* v. *Hud. Riv. Railroad*, 35 N. Y. 26; *Schum* v. *P. Railroad*, 107 Penn. 8; *Brown* v. *H. and St. Jo. Railroad*, 50 Mo. 467.

Traveler may have reason and excuse for not using the care and diligence which he otherwise and naturally would; and thus the presumption of contributory negligence may be repelled. *Linfield* y. *O. C. Railroad*, 10 Cush. 562; *Sweeny* v. *Same*, 10 Allen, 377; *Wheelock* v. *B. and A. Railroad*, 105 Mass. 207; *Tyler* v. *N. Y. and N. E. Railroad*, 137 Mass. 242; *Low* v. *G. T. Railroad*, 72 Maine, 321; *Plummer* v. *E. Railroad*, 73 Maine, 592; *State* v. *M. C. Railroad*, 76 Maine, 365; *Same* v. *Same*, 77 Maine, 543; *Ernst* v. *Hud. Riv. Railroad*, 35 N. Y. 25; *Penn. Railroad* v. *Ogier*, 35 Penn. 60; *Spencer* v. *Ill. Cen. Railroad*, 29 Iowa, 55; *Butler* v. *M. and St. P. Railroad*, 28 Wis. 501; *Ernst* v. *Hud. Riv.*

*Railroad*, 32 Barb. 159 ; *Funston* v. *Ch. etc. Railroad*, (Iowa.) 14 Am. & Eng. R. R. Cases, 640.

The negligence of the railroad corporation may thus excuse the traveler. *Norton* v. *E. Railroad*, 113 Mass. 369 ; *Prescott* v. *Same, Id.* 371 ; *Pollock* v. *Same*, 124 Mass. 158 ; *Brooks* v. *B. and M. Railroad*, 135 Mass. 21 ; *Copley* v. *N. H. and N. Co.* 136 Mass. 9 : *Sonier* v. *B. and A. Railroad*, 141 Mass. 10 ; *McKimble* v. *B. and M. Railroad, Id.* 470 ; *Plummer* v. *E. Railroad, supra* ; *Lesan* v. *M. C. Railroad*, 77 Maine, 87 ; *Mackay* v. *N. Y. C. Railroad*, 35 N. Y. 75 ; *Richardson* v. *Same*, 45 N. Y. 849 ; *Glushing* v. *Sharp*, 96 N. Y. 676 ; *P. C. and St. L. Railroad* v. *Gundt*, 78 Ind. 373, or 3 Am. & Eng. R. R. Cases, 502 ; *Penn. Railroad* v. *Ogier*, 35 Penn. 60 ; Shear. & Red. on Neg. § 30 ; Patterson's "Railway Accident Law," 173.

Traveler has a right to assume and rely upon the discharge of duty on the part of the corporation and its servants, cases already cited, *supra. Ernst* v. *Hud. Riv. Railroad*, 35 N. Y. 25 ; *Same* v. *Same*, 39 N. Y. 61, 68 ; *Roberts* v. *C. and N. W. Railroad*, 35 Wis. 679 ; *Phil. and Tr. Railroad* v. *Hagan*, 47 Penn. 244 ; *Gray* v. *Scott*, 66 Penn. 345 ; Shear. & Red. on Neg. § 31 ; Beach on Contrib. Neg. § 64.

The gates being open, and the customary warnings not given, is equivalent to an assurance of safety. *Ernst* v. *Hud. Riv. Railroad*, 35 N. Y. 25 ; *Same* v. *Same*, 39 N. Y. 61, 68 ; *Glushing* v. *Sharp*, 96 N. Y. 676, or 19 Am. & Eng. R. R. cases, 372 ; *Phil. and Read Railroad* v. *Killips*, 88 Penn. 405 ; Patterson's "Railway Accident Law," 170.

Whether or not Benjamin was "in the exercise of due care and diligence," is not a matter of law, but wholly for the jury. *Warren* v. *Fitch. Railroad*, 8 Allen, 231 ; *Gaynor* v. *O. C. and N. Ry. Co.* 100 Mass. 212 ; *Chaffee* v. *B. and L. Railroad*, 104 Mass. 115 ; *Wheelock* v. *B. and A. Railroad*, 105 Mass. 206 ; *Williams* v. *Grealy*, 112 Mass. 81 ; *Norton* v. *E. Railroad*, 113 Mass. 369 ; *French* v. *T. B. Railroad*, 116 Mass. 540 ; *Craig* v. *N. Y. N. H. and H. Railroad*, 118 Mass.

437; *Treat* v. *B. and L. Railroad*, 131 Mass. 372; *Brooks* v. *B. and M. Railroad*, 135 Mass. 21; *Ropley* v. *N. H. and N. Co.* 136 Mass. 9; *McDonough* v. *M. Railroad*, 137 Mass. 212; *Tyler* v. *N. Y. and N. E. Railroad, Ibid.* 241; *Learoyd* v. *Godfrey*, 138 Mass. 324 *Lyman* v. *Hampshire*, 140 Mass. 311; *Sonier* v. *B. & A. Railroad*, 141 Mass. 10; *McKimble* v. *B. & M. Railroad, 1d.* 470; *Webb* v. *P. & K. Railroad*, 57 Maine, 133; *O'Brien* v. *McGlinchy*, 68 Maine, 555; *Plummer* v. *E. Railroad*, 73 Maine, 592; *Lesan* v. *M. C. Railroad*, 77 Maine, 90; *Shannon* v. *B. & A. Railroad*, 78 Maine, 60; *Ernst* v. *H. R. Railroad*, 35 N. Y. 25; *Dolan* v. *Del. & Hud. Railroad*, 71 N. Y. 285; *Smedis* v. *B. & R. B. R. R.* 88 N. Y. 13; *Glushiny* v. *Sharp*, 96 N. Y. 676; *Butler* v. *M. & St. P. Railroad*, 28 Wis. 487; *Roberts* v. *Rh. & N. W. Railroad*, 35 Wis. 680; *Eilert* v. *G. B. & M. Railroad*, 48 Wis. 606; *Lehigh Val. Railroad* v. *Hall*, 61 Penn. 361; *Cleveland* v. *P. Railroad*, 66 Penn. 399; *Penn. Railroad* v. *Ackerman*, 74 Penn. 265; *Same* v. *Weber*, 76 Penn. 157; *Weiss* v. *P. Railroad*, 79 Penn. 387; *Same* v. *Same*, 87 Penn. 447; *Phil. & Read. Railroad* v. *Killips*, 88 Penn. 405; *Schum* v. *P. Railroad*, 107 Penn. 8; *Artz* v. *C. R. I. & P. Railroad*, 34 Iowa, 153; *Meyers* v. *Same*, 59 Mo. 223; *Trow* v. *Vt. Cen. Railroad*, 24 Vt. 495; *Ernst* v. *Hud. Riv. Railroad*, 32 Barb. 159; *Kan. Pac. Railroad* v. *Richardson*, 6 Am. & Eng. Ry. & Cases, 96; Shear. & Red. on Neg. § 43; Thompson on Neg. Vol. 1, p. 429; Hill on Torts, Vol. 2, p. 490; Beach on Contrib. Neg. § 65; Patterson's "Railway Accident Law," p. 168, 170.

*George C. Yeaton and B. F. Chadbourne*, for the defendant.

This process, in form an indictment, in substance a civil suit for the benefit of the widow and children of William R. Benjamin, killed by a train on defendant's railroad, at a grade crossing in Biddeford, November 26, 1886, is governed by the rules of law applicable to civil proceedings. *State* v. *Grand Trunk R'y*. 58 Maine, 176-182; *State* v. *M. Cent. Railroad* 76 Maine, 357-364.

Whenever the evidence leaves the case such that a verdict against the defendant would be set aside, it is not merely the right, but the duty, of the court to order a non-suit, or direct a verdict for defendant. *Heath* v. *Jaquith*, 68 Maine, 433; *Merrill* v. *North Yarmouth*, 78 Maine, 200; *Warren* v. *Fitchburg Railroad Co.* 8 Allen, 227; *Butterfield* v. *Western Railroad Corp.* 10 Allen, 532; *Chaffee* v. *Boston and Lowell Railroad*, 104 Mass. 108; *Barstow* v. *Old Colony Railroad,* 143 Mass. 535; *Railroad* v. *Houston*, 95 U. S. 697; *Schofield.* v. *Chic. Mil. and St. Paul Railroad, Co.* 114 U. S. 615; Patterson's R. R. Accident Law, 173; cases cited in note 4, 175.

The foundation of this process is solely statutory. R. S., c. 51, § 68, provides for its maintenance, where deceased was "in the exercise of due care and diligence," and the injuries caused by the negligence of defendant corporation or its employees. It is clear that before any question can be raised concerning defendant's negligence, plaintiffs must establish the fact that deceased was then "in the exercise of due care and diligence." But, in order to secure respectable uniformity of results, it has been found necessary for courts to formulate certain rules, and. in some cases, at least, to define what constitutes "due care and diligence." Perhaps in all the wide range of cases where human conduct falls under judicial examination, no class can be found. in which, with less judicial dissent, any specific rule has been so. widely and uniformly expressed, as the one which requires one knowingly approaching a railroad crossing at grade, while traveling on the highway, to look and listen, if he has, opportunity, before attempting to pass over; and that any omission so to do, is a failure to exercise "due care." Citations. here are superfluous; still, the following recent cases illustrate the steady and uniform application of this rule in widely separated jurisdictions. *Railroad* v. *Miller*, 25 Mich. 290; *Haas.* v. *Gr. Rap. and Ind. Railroad, Co.* 47 Mich. 401; *Eilert* v. *Green Bay and Minn. Railroad Co. Id.* 606; *Union Pac. Railroad Co.* v. *Adams*, 33 Kan. 427; *Garland* v. *Chic. N. W. Railroad Co.* 8 Brad. (Ill.) 571; *Wabash, St. L. & Pac. R'y.* v. *Neikirk*, 15 Brad. (Ill.) 172; *Chic. N. West. Railroad Co.*

v. *Gertsen, Id.* 614. (In this case where the court below charged that it was the duty of travellers to "look or listen," the case was sent back because the charge should have been that it was his duty to "look and listen ;" and this in a state where the doctrine of "comparative negligence" has been promulgated.) Similarly in this state the subject has been thoroughly examined, and the same settled rules affirmed. *Grows* v. *M. C. R. R.* 67 Maine, 100 ; *State* v. *M. C. R. R.* 76 Maine, 357 ; *Lesan* v. *M. C. R. R.* 77 Maine, 85 ; *State* v. *M. C. R. R. Id.* 538 ; *Chase* v. *M. C. Railroad,* 78 Maine, 346.

In many cases it has been held that "no omission of duty" on the part of the corporation, or its employees, relieved the traveller from his duty to look and listen. Among the later, are, in addition to some of those hereinbefore cited : *McGrath* v. *N. Y. Cent. and H. R. Railraod Co.* v. 59 N. Y. 469 ; *Culhane* v. *N. Y. Cent. and H. R. Railroad Co.* 60 N. Y. 134 ; *Dolan* v. *Del. and Hud. Canal Co.* 71 N. Y. 285 ; *Tolman Adm.* v. *Syr. and Bing. and N. Y. Railroad,* 98 N. Y. 198 ; *Thompson* v. *N. Y. Cent. and H. R. Railroad Co.* 33 Hun. 16 ; *Hixon* v. *St. L. Han. and Keok. Railroud Co.* 88 Mo. 335 ; *Drain* v. *St. L. Iron M. and Southern Railroad Co. App.* 10 Mo. App. 531 ; *Tol. Wab. and West R'y. Co.* v. *Schuckman Adm.* 50 Ind. 42 ; *Pitts. Cin. and St. L. R'y. Co.* v. *Gundt* 78 Indiana, 373 ; *Penn. Railroad Company* v. *Righter,* 42 N. J. L. 186 ; *Berry* v. *Penn. Railroad Co.* (New Jersey, May, 1886,) 26 Am. & Eng. R. R. cases, 396 ; see also cases cited in last paragraph of note, p. 181, to *Phil. and Read. Railroad Co.* v. *Boyer,* (Penn. Jan. 1881,) 2 Am. & Eng. R. R. cases, *Id.* pp. 226 *et seq.* in notes "no man has a right to depend entirely upon the care and prudence of others ;" 19 Am. & Eng. R. R. cases, note a. p. 260, last paragraph ; Beach on Contr. Neg. 64 ; Deering on Neg. Tit. R. R. § 244 ; Patterson's R. R. Accident. Law, 167, 168, last paragraph of 169 ; *Lehigh Val. Railroad Co.* v. *Brandtmaier,* (Penn. April 14, 1886,) 18 weekly notes of cases in Penn. 474 ; 2 Lacey's Dig. R. R. Law Tit. Injuries to persons on the track, 149, 151 ; and 1 Thomp.

Neg. p. 426, cited with approval by this court in *Lesan* v. *M. R. R. supra.*

The following pertinent language was employed by the court in *Wilds* v. *Hud. Riv. Railroad Co.* 24 N. Y. 430, 440, after alluding to the oft repeated declarations of the "alarming power of a locomotive and the appalling danger of running one anywhere but in a wilderness :" " All this is very true ; but there are two sides to these facts. If a locomotive be eminently dangerous, everybody knows it to be so. And it is as dangerous to run against, or under it, as to have it run over you. A railroad crossing is known to be a dangerous place, and the man who, knowing it to be a railroad crossing, approaches it, is careless unless he approaches it as if it were dangerous. To him the danger is vastly greater than it is to the locomotive ; he may lose his life. And if the company be bound to use very great care not to endanger him, why is not he bound to use equally great care not to be endangered? His care should be as much graduated by the danger as the company's. When everyone who knows that the railroad is there is bound to know, and to remember, that a train may be approaching, not to take the very simple precaution of looking and listening to find out whether one is coming, cannot but be want of care. To be sure the statute requires a railroad company to give specified warnings ; but it neither takes away a man's senses, nor excuses him from using them (18 N. Y. 425, 426). The danger may be there. The precaution is simple. To stop, to pause, is certainly safe. His time to do so is before he puts himself in ' the very road of casualty.' And if he fails to do so, it is of no consequence, in the eye of the law, whether he merely misjudges, or is obstinately reckless. His act is not careful, and he is to abide the consequences, not the company under or into whose train he saw fit to run, whether he did so in inexcusable ignorance or in the belief that he could run the gauntlet unharmed." Similarly said DEVENS, J., in *Hinckley* v. *Cape Cod Railroad Co.* 120 Mass. 257, 262, " While one may, in the exercise of reasonable care, rely to a certain extent upon the performance of his duty by the other, no negligence of such other can be so dominant as to

relieve him from his own obligation, and if a performance of such obligation might have prevented the injury, this failure so to perform must be considered as contributing thereto."

All these cases, in their reasoning completely cover, and many of them present, actual instances of absent flagmen and open gates. However, there are several English, and two or three American cases, sometimes inaccurately cited as giving countenance to the claim that an open gate is equivalent to an invitation to pass over without other precautions. Perhaps the leading English cases on this subject are : *Stapley and another, Executors,* v. *London Brighton and South Coast* Ry. *Co.* L. R. 1 Exch. 21 ; and *Lunt* v. *London and No. West.* Ry. *Co.* 1 Law. Rep. Q. B. Cas. 277. That these cases are not authority for so broad a position here, is apparent from the peculiar provisions of the English act of Parliament on which they rest. Railway Clauses Consol. Act of 1845, § 47 (8 and 9 Vict. c. 20), expressly requires every railway company to erect gates at all crossings on a level, and constantly to keep " proper persons to open and shut such gates ; and such gates shall be kept constantly closed across such road on both sides of the railway except during the time when cattle, carts or carriages passing along the same shall have to cross such railway," from which it is clear (1) that the duty to maintain the attendance of a flagman is universal, and (2) that closed across the highway is the normal condition of the gates, their open condition exceptional—exactly opposite to the custom in this country. Furthermore, in *Lunt* v. Ry. *Co.* the traveler not only saw the employee open the gate, but was instructed by the same employee to " come on."

Somewhat similar to the English statute are the provisions of statutes in New York, as to crossings in some of the larger towns and cities ; hence, in *Glushing* v. *Sharp,* 96 N. Y. 676, when a gateman was seen to be in attendance and to raise the gates, this was held to entitle the plaintiff to go to the jury.

In *Phil. & Reading Railroad Co.* v. *Killips,* 88 Penn. St. 405, when a gateman left at 7 P. M., and a little past 7 P. M., a traveler who attempted to cross without looking where he might· have seen, although " he did look " at certain other points, was

also permitted to go to the jury by a divided court.   But *Phil. & Reading Railroad Co.* v. *Boyer*, 97 Penn. St. 91, holds that if the traveler had information from another source, it is "no matter what the flagman did or did not do."

In *Lake Shore and M. S. Railroad* v. *Sunderland*, 2 Brad. (Ill.) 307, it is pointed out that the only case which seems to afford plaintiffs here any sort of judicial support, the case of *St. L. Van. and Terre H. Railroad Co.* v. *Drum*, 78 Ill. 197, rests upon the doctrine of " comparative negligence."

The following among the most recently reported cases, in some of which the plaintiff was permitted to go to the jury, and in some of which he was not, are all in harmony with the contention of defendant here : *Dublin, Wicklow and Wexford Ry. Co.* v. *Slattery*, 3 L. R. App. Case, 1155 ; *Wakelin, App'l't,* v. *London and South Western Railroad Co.* 12 L. R. App. Case (House of Lords, March 1, 1887), part 1, p. 41 ; *Roades* v. *Chic. and Grand Trunk Ry.* 58 Mich. 263 ; *Greany* v. *Long Island Railroad Co. App'l't*, 101 N. Y. 419 ; *Burns* v. *North Chic. Rolling Mill Co.* 65 Wis. 312 ; *Central Trust Co.* v. *Wab. and St. Louis and Pac. Ry. Co.* (Circ. Ct. E. D. Mo. Mich. 24, 1886), 27 Fed. Rep. 159.

The statement in Whittaker's Smith on Neg. 401, as to the traveler being " misled " by open gates, is carefully qualified by " possibly, if there were a statutory duty on the railway," and supported by citation, in notes, of the English cases we have examined.

Obviously, it is needless to consider the doctrine governing the rights of persons confused or misled by express directions or conduct of authorized agents of the corporation, acting within the scope of their several duties, as exemplified in the case of passengers in *Warren* v. *Fitchburg Railroad Co.* 8 Allen, 227 ; and in the case of travelers not passengers, in *Sweeny* v. *O. C. and Newport Railroad Co.* 10 Allen, 368 ; or those of a traveler who is not aware that he is approaching a railroad crossing, as in *Elkins* v. *Boston & Albany Railroad*, 115 Mass. 190.

Should it be claimed that deceased and his companions were mistaken in their judgment that the train was on the other road

(as certain evidence plaintiff offered would seem to indicate as possible), two replies are clear : (1) In fact, it does not appear that this was their judgment,—one said he " couldn't tell which road it was on ;" the other said he " could not tell,"—but rather that their minds were not at rest on the subject.    (2) In law, had such been their judgment, it was erroneous, and an erroneous judgment, when correct conclusions might easily have been verified, will not avail to give the traveler who is not in the exercise of " due care and diligence." the rights of one who is. *Harris* v. *Ill. Cent. Railroad Co.* 41 Iowa, 227 ; *Benton* v. *Central Railroad of Iowa*, 42 Iowa, 192 ; *Schæfert* v. *Chic. M. and S. P. Railroad Co.* 62 Iowa, 624 ; *Prul.* v. *S. L. K. C. and N. Ry.* 73 Mo. 168 ; Patterson, Railroad Ac. Law, 162.

PETERS, C. J.    After the plaintiff's evidence was out in this case, it was agreed by the parties that, if such evidence be, in the opinion of the full court, sufficient to authorize a jury, *in any event*, to find for the plaintiff, a judgment may be entered against the defendants for the sum of five thousand dollars.

Allowing to the plaintiff, under this stipulation, the benefit of the most favorable view which the evidence is legally susceptible of, it may be considered that the following facts are proved : The deceased, William B. Benjamin, for whose death the action is instituted in the name of the state, and two other men, of the names of Burnie and Hooper, the latter owning and driving the team, were sitting in an open, one-seated wagon, and approaching at a moderate gait, or "very slowly," a level crossing of defendants' railroad over the highway in Biddeford.    It was at about ten o'clock on a starlight night in November, 1886.    The railroad and town road intersect at about a right angle.    The three were persons of middle age, with physical faculties unimpaired, sober and intelligent, and were returning home from a lodge meeting of some kind over a road familiar to all of them.    When within about three hundred and fifty feet of the crossing a locomotive whistle was heard, but no bell was heard by them at any time. The bell was heard by others at the moment when the locomotive was passing the crossing, the train at the time running at a rate

of not less than twenty-five miles an hour through a compact portion of the city of Biddeford.   When the whistle was heard, Burnie called Hooper's attention to it, and Hooper said he did not know which road it was on, meaning whether on the Boston and Maine or Eastern railroad.   Burnie replied that he could not tell from the sound which road it was on. The deceased said nothing, and nothing more was said by either of them.   The team moved on without stopping, and almost immediately it reached the Boston and Maine track, when a collision took place between locomotive and team by which two of the three men were almost instantly killed.   The way on which the parties were traveling was slightly descending towards the crossing, and a view of the coming train was mostly obstructed from the travelers by houses and other structures, and the plans and photographs show that there may have been no opportunity for the travelers to see the train, situated as they were while in motion.

The defendants contend that the travelers did not look and listen after their interchange of words about the direction of the sound from the whistle.   We think a jury would be justified in the belief that they did.   On this point the survivor was not very explicit in his testimony, but he was not asked about it, nor was he at all exhaustively examined.   The men did not in fact see the locomotive until they were within an estimated distance of fifteen feet from the track, the train being about one hundred feet away, and a collision may not then have been avoidable.   At the place where the whistle was sounded the two railroads were within three hundred feet of touching together, then diverging until at the crossing they were about one thousand feet apart, the Eastern being the farthest away.

It is reasonable to believe that the three men, as they approached the crossing, saw that the gates there were open and unattended by any person, and that there was no signal of any kind indicating that a train was expected.   A red light was burning, the usual switch signal, which was not any warning to those using the common roads.   The gates were of the double-arm pattern, operating on pivots on each side of the highway,

when open the arms standing erect, and these had been in use at this crossing for about three years. An employee was in daily attendance upon them from seven o'clock A. M. until about fifteen minutes after seven P. M. when he usually locked the gates and left them for the night doing so on the night of the catastrophe. The train which struck the wagon. was the regular night Pullman train running from Boston to Bangor, on the Boston and Maine road. This train has run most of the time for many years over the Eastern railroad, but had been running over the Boston and Maine road for about a month before the accident, and had also run on the same road for a period of eight months during the year before the accident. The two roads were managed by the same company. The survivor, and the same thing may be fairly assumed of his associates, had seen that gates were in operation at the crossing, but had never noticed that they were not at all times used when trains were passing. They supposed that they were so used. The flagman in the railroad employment testified that, when for any reason the gates were out of order, he used a green lantern by night and a yellow flag by day whenever a train passed.

It is not denied that the defendants were themselves guilty of negligence. They were running their train at a rate of speed upwards of four times the rate allowed by law. Chapter 377, of the acts of 1885, prohibits a train running across a highway near the compact part of a town at a speed greater than six miles an hour, unless the parties operating the railroad maintain a flagman or a gate at the crossing. Had not the defendants been remiss in the discharge of this statutory duty, it is reasonable to conclude that the accident would not have happened.

Nor would the accident have occurred, the defendants contend, if the deceased had not also been guilty of negligence. Great stress is placed by the defendants' counsel upon the position taken for his clients that the three men did not look and listen for the location of the train, or, if they did, that they paid no heed to the signals which their ears revealed to them. It certainly cannot be denied that it was an egregious blunder for

the team to continue moving on so near to the crossing, while the occupants could not tell from which railroad, the sound of the whistle proceeded, unless other facts furnish an excuse for not stopping. The team should have halted. The very doubt felt by the men was notice enough of danger, unless they were, without their own fault, deceived by the surrounding circumstances.

The plaintiff's counsel insists that such excuse exists. It is contended on that side of the case that, taking into consideration that the train was not seen, though the deceased and his associates must have been intent upon their situation, as evidenced by their sudden silence as they were advancing on their way after their interchange of views on the subject, and considering also the fact that they had much reason to suppose that the Pullman train belonged upon the most distant road, the sight of the uplifted arms of the gates was evidence enough to dissolve all doubt in the minds of those men, and to induce them to believe that they could safely continue on without interruption. The plaintiff's counsel contends that such was the judgment of three men, who for intelligence and experience would average well with men generally.

The counsel for the defendants contends that the standing arms, indicating open gates, should not be regarded as any signal, or a sufficient signal, of safety, at any crossing where the law does not require gates to be maintained. At this place the gates were erected by the voluntary act of the company. But is it not a fair construction of the statute to say that it does require gates to be maintained, or a flagman to be present, at all grade crossings, as to trains moving more rapidly at such places than six miles an hour? And while a neglect of the company to perform its duties does not excuse the traveler in a neglect of the duties and degree of care which the law imposes on him, still, in making his calculation for crossing a railroad track safely, he is often justified in placing some reliance on a supposition that the company will perform the obligation resting on it, where there is no indication that it will do the contrary. If the gates were open and the crossing unattended by a flagman,

then these persons had a right to accept the fact as some evidence that the train would not attempt to pass the crossing at a faster speed than six miles an hour. Of course full reliance cannot always be placed on an expectation that a railroad company will perform its duties, when there is any temptation to neglect them, because experience teaches us that it would not be practicable to do so. But such an expectation has some weight in the calculation of chances, greater or less according to the circumstances. But what essential difference can it make in the relation of the parties whether the statute requires a flagman at any point or whether absolute necessity requires one; whether the legislature declares the necessity, or the company by its act confesses the necessity ?

The defendants, by their counsel, contend that the English and New York authorities, cited by plaintiff, are based upon a statutory requirement that gates shall be maintained. That is not entirely correct. In a leading case, *Stapley* v. *London, &c. Ry. Co.* L. R. 1 Ex. 21, it was said that while there was no law requiring gates as to foot passengers, still the decision was that the footman in that case was fairly invited by the open gates seen by him to attempt a passage across the tracks. Nor do we find that the New York cases place the responsibilities of railroads wholly on what the statute law requires of them as to guards at crossings. It is said in *Kissenger* v. *N. Y. & Harlem R. R. Co.* 56 N. Y. 538, "though it is not negligence for a railroad company to omit to keep a flagman, still, if one is employed at a particular crossing, his neglect to perform the usual and ordinary functions of the place may be sufficient to charge the company." See *Glushing* v. *Sharp*, 96 N. Y. 676. If the presence of a flagman and closed gates indicate a passing train, certainly the absence of the flagman and open gates must be evidence that a train is not presently due or expected. The annexed authorities touch nearly to the point involved in the facts here presented. *Wheelock* v. *B. & Alb.* R. R. *Co.* 105 Mass. 203; *Tyler* v. *N. Y. & N. E.* R. R. *Co.* 137 Mass. 238; *Sonier* v. *B. & Alb. R. R. Co.* 141 Mass. 10; Whar. Neg. § § 385, 386, and cases. *Pierce, Railroads,* 203, and cases.

The plaintiff's case is fortified by another consideration. He neither drove, nor, as far as appears, had any control of the team on which he was riding. It is reasonable to suppose that the owner carried him either for hire or gratuitously as a neighborly kindness. His position was not of the same degree of responsibility to the railroad as was that of the driver. He was a comparatively passive party. Not that he had no duty to perform. He could have asked the driver to stop the team, or he could have left it. But it would be natural, even though his fears were excited, that he should defer to some extent to the experience and discretion of the driver, who was in the control of his own team, and before he had time to assert his own judgment against the driver's, or perhaps fully appreciate the situation, the inevitable event was upon him. We think this fact has considerable force in the combination of circumstances which weigh against the charge of contributory negligence.

And we may consider this point in the argument in behalf of the plaintiff, unless we adhere to the doctrine of imputable negligence, which has been considerably practiced on in the courts, first promulgated in the case of *Thorogood* v. *Bryan*, 8 C. B. 115, a doctrine which ascribes to a passenger the contributory negligence of a driver over whom he has no control.

This doctrine was never adopted in Scotland, nor by the English admiralty court, and was never at rest but has been constantly doubted and criticised in other English courts, until, in 1887, it was overruled by the court of appeal, without a dissenting vote on the question, in the exhaustively considered case of *The Bernina* L. R. 12 Pro. Div. 58. The action in that case, though origniating in the admiralty, was brought under Lord CAMPBELL'S act, and was governed in all respects by common law rules, and the full court of England unhesitatingly swept away the old rule, saying that it was a fictitious extension of the principle of agency unwarranted upon any rule or theory of law. It is remarked in that case that the preponderance of judicial and professional opinion in England is against the doctrine, and that the weight of judicial opinion in America, is also against it. The same decision has been made in the Supreme

Court of the United States in *Little* v. *Hackett,* 116 U. S. 366, where it is said that the doctrine of *Thorogood* v. *Bryan,* rests upon indefensible foundation. It is there declared that the identification of the passenger with the negligent driver, without his co-operation or encouragement, is a gratuitous assumption. The same view of the question is entertained by text-writers generally, especially in last editions of their works. The older doctrine is rapidly fading out.

A distinction has sometimes been attempted to be made between riding in a public or riding in a private carriage, but that idea has not prevailed to any considerable extent. The cases discuss, as an English court puts it, the broad question as to what is the law applicable to a transaction in which one has been injured and in the course of the transaction there have been negligent acts or omissions by more than one party. In quite a number of the cases the facts were precisely as they are here, and the distinction is not heeded. A few cases like or nearly like the present case are the following : *Robinson* v. *N. Y. Cen.* R. R. 66 N. Y. 11 ; *Masterson* v. *N. Y. Cen.* R. R. 84 N. Y. 247 ; *Cuddy* v. *Horn,* 46 Mich. 596 ; *Transfer Co.* v. *Kelly,* 36 Ohio St. 86 ; *Bennett* v. *N. J. &c. Co.* 36 N. J. L. 325 ; *N. Y. &c.* R. R. *Co.* v. *Steinbrenner,* 47 N. J. L. 161 ; *Wabash, &c.* R. *Co.* v. *Schacklett,* 105 Ill. 564. See *Borough of Carlisle* v. *Brisband,* 113 Penn. St. 544 ; S. C. 57 Amer. R. 483, and cases in note.

We are not committed to the doctrine of *Thorogood* v. *Bryan,* in this state to an extent preventing its repudiation. In *Dickey* v. *Telegraph Co.* 43 Maine, 492, the rule was acted on without any expression of dissent by counsel.

The doctrine of imputable negligence as applicable to the relation of parent and minor child, which presents another and a somewhat different question, has been favorably alluded to in this state, but in cases where it did not affect the result reached on other grounds. *Brown* v. *E. & N. A. Ry. Co.* 58 Maine, 384 ; *Leslie* v. *Lewiston,* 62 Maine, 468.

A class of cases against towns for injuries caused by defective

highways, being statutory actions, stand upon a ground of their own, unaffected by the rule under discussion.

On the terms of the submission of this case to the court by the parties, we think judgment must be entered for the plaintiff for the sum agreed upon as damages.

WALTON, VIRGIN, LIBBEY, FOSTER and HASKELL, JJ., concurred.