STARTZ *v.* PENNSYLVANIA & N. Y. CANAL & RAILROAD CO. *et al.*

*(Superior Court of Buffalo, General Term.* December 30, 1891.)

**1. RAILROAD COMPANIES—ACCIDENTS AT CROSSINGS—CONTRIBUTORY NEGLIGENCE.**

Plaintiff's intestate was killed by an engine rapidly backing across a city street. The evidence showed that deceased was slowly driving a wagon, loaded with furniture, across the tracks, and was walking by the side of the wagon opposite to that which the engine struck; that the tracks, in the direction from which the engine came, were concealed by the wagon from deceased; that as he approached the crossing the safety-gates nearest to him were up, but that those on the opposite side of the tracks were down; that just as his horse passed under the gates they commenced to decend. Whether he saw them descending, or heard the automatic gong attached thereto, or the warning shouts of the gateman, did not appear. The evidence further showed that the engine sounded neither bell nor whistle, and was running at a high rate of speed, in violation of a city ordinance, and, had there been a vigilant watch by the persons in charge of the engine, the wagon would have been seen in time to have stopped the engine before striking it. *Held,* that the question of decedent's contributory negligence was properly submitted to the jury.

**2. SAME—LIABILITY OF LESSOR AND LESSEE COMPANY.**

Where the engine in such case was the property of a company who had leased the right to run its trains over the tracks of the company owning and operating the gates, a verdict on the evidence set forth above was properly rendered against both companies.

Appeal from trial term.

Action by Barbara Startz, administratrix, against the Pennsylvania & New York Canal & Railroad Company, and the New York, Lake Erie & Western Railroad Company, for the death of Joseph Startz, alleged to have been caused by defendants' negligence. From a judgment for plaintiff, and from an order denying a motion for a new trial, made on a case and exceptions, defendants appeal. Affirmed.

Argued before BECKWITH, C. J., and HATCH, J.

*Frank Brundage,* for appellant Pennsylvania & New York Canal & Railroad Company. *Geo. F. Brownell,* for appellant New York, Lake Erie & Western Railroad Company. *George W. Cothran,* for respondent.

HATCH, J. It is claimed that Joseph Startz was killed by concurrent acts of negligence, committed by the defendants, under such circumstances as authorized the jury to find that both were liable, and that he was at the time free from any negligence which contributed thereto. Upon the trial it was conceded by all parties that the defendants were only liable for the neglect of duty of their own agents and servants which proved to have been the proximate cause of the injury. Both defendants, however, stand upon common ground with respect to the contributing negligence of the decedent, and, as this question must be solved in favor of the plaintiff in order to support the judgment and order appealed from, it first engages our attention. From the evidence it appears that deceased was, on the 5th or 6th day of March, 1888, engaged in removing a load of furniture, with a horse attached to a wagon. That such employment necessitated the crossing the tracks of the Erie Railroad, which intersect Smith street in the city of Buffalo. The point on Smith street where deceased crossed is occupied by two main lines of tracks and by five switch or junction tracks, which form a connection with the main tracks, and also with several long switch tracks, it being in fact a part of the Erie Railroad's yard system. The width, from the northerly rail of the first track to the southerly rail of the last track, is about 88 feet. At this point, upon Smith street, the Erie Railroad has erected gates, raised and lowered by means of a crank, and which also strikes, automatically, a gong as the gates rise and descend. The northerly gate is located four feet from the first track, which is five feet wide, and the intervening space about eight feet,

When the "west-bound track," so-called, is reached, this is the most northerly main track, and its first rail is seventeen feet from the gate. The southerly gate is located south of the most southerly track, about the same distance therefrom as the northerly gate. These gates have been so erected and operated, as a protection to the road and the public, for many years. The view from Smith street, as the tracks are approached, is obstructed until a point 6 feet from the first track is reached, where a view to Seneca street—a distance of about 310 feet—would be obtained. Upon the day in question deceased approached the crossing from the north, from four to six hundred feet in the rear of a team attached to a sleigh, also loaded with furniture, and which he was following. This team passed over in safety. When deceased reached the northerly gates they were raised. He was at that time on the right-hand side of his wagon, upon the ground, walking near the forward wheels; the wagon-box and load projected above his head, and effectually shut off any view from the east. His head was covered by a cap, pulled down, and he was proceeding at the rate of from two to two and one-half miles an hour. He had driven the horse across the west-bound track, and the wagon was upon it, when an engine operated by the Pennsylvania road—it having leased the right of operating its trains upon the Erie's tracks—backed at a rapid rate of speed upon the track, struck the wagon at about its forward wheels, and killed deceased instantly.

The evidence with respect to the condition of the gates when the deceased passed under them, and of the signal given by the flagman stationed at the crossing, and who operated the gates, was conflicting. Thives, who drove the sleigh followed by deceased, states on his direct examination: "Saw him when he came upon the Erie crossing. The gates were open. I saw them close down. They were behind him. That left him on the tracks, and the gates behind him closed. I was looking right at him when he entered on the crossing." On cross-examination he said: "I was noticing at the time the gates commenced to come down on the side he came from. I paid particular attention to that, and noticed it as quickly as he got on the track. The gates commenced to come down before he got on the first track, and came down on his box,—on the top of the box. I was then 600 feet away. I could tell exactly the place where they were coming down. At the time the gates first commenced to come down the horse was under the gates, and Startz was back of the gate, a little behind, right along-side his wheel." Julia Boas testified that the wagon was just back of her, about 15 feet, as she crossed the track on foot. That she saw no flagman, and paid no attention to the gates. On cross-examination she stated the gates were up as she passed them. Peter Pfeiffer states that he saw the wagon going on the tracks. That the gates then looked as if they were in motion, coming down, but were not down, —standing at an angle. Eva Foote testified that when she entered upon the crossing the gates were up, no gateman there. That the horse and wagon were about the length of the wagon, back. Peter Coleman testified that he saw deceased and the engine. That as the engine approached the crossing the gateman was letting down the gates, but could not get them down, as they would come down between the horse and wagon. That the gateman called upon deceased to stop. He was then on the first track, but paid no attention, drove right along, and was struck. Timothy Cary testified that he was the gateman on the south side. That he commenced to lower his gates when the gateman at Seneca street lowered his. The latter gate was situated about 310 feet further east. That his gates were down when he first noticed the horse and wagon. Heard the gateman call to hold on, but did not notice the gates. Thomas Sheehan testified that he saw the gates lowering down, but did not see the horse and wagon when they were lowered down. Heard the gateman, Ryan, call to hold on. The gates could be lowered very quickly,— in a few seconds' time.

The jury were authorized to find that the engine which struck deceased approached the crossing at a rate of speed approximating 20 miles an hour, without sounding either bell or whistle.   The court submitted to the jury the question as to whether the act of deceased in entering upon the crossing, and his conduct thereafter, was negligent.   The charge was quite as favorable to defendants, in this respect, as they were entitled to.   It seems quite clear that the jury would be authorized to find that when deceased reached the gates they were up; that the gateman was absent from his post.   Under such condition there was conveyed to deceased a notice—upon which, to some extent at least, he might rely—that it was safe for him to proceed.   How far such condition relieved him from active vigilance, so that his subsequent acts can be characterized as negligent, is the question.   In *Palmer* v. *Railroad Co.*, 112 N. Y. 234, 19 N. E. Rep. 678, the court said: "It is obvious that an open gate was a direct and explicit assurance to the traveler that neither train nor engine was rendering the way dangerous,—that none was passing. A closed gate was an obstruction preventing access to the road; an open gate was equally positive in the implication to be derived from it that the way was safe.   Nothing less could be implied, and no other conclusion could be drawn, from that circumstance."   This doctrine is again reiterated and applied in *Oldenburg* v. *Railroad Co.*, 124 N. Y. 418, 26 N. E. Rep. 1021. The same rule has also been adopted by the supreme court.   *Fitzgerald* v. *Railroad Co.*, (Sup.) 10 N. Y. St. Rep. 433; *Phillips* v. *Railroad Co.*, (Sup.) 6 N. Y. Supp. 621.   In the latter case the court says: "Such gates, when properly and judiciously managed, are obviously well calculated to afford the traveling public great protection when approaching railroad crossings.   But, if negligently manipulated, it can be readily perceived that, so far from giving the needed notice of the approach of a train of cars, the lowering of the gates at the moment a team enters upon the crossing would be likely to increase, rather than diminish, the danger, as the device, under such management, would be likely to become a trap, as it seems to have been upon the occasion in question."   This language, in the view the jury took of the evidence, is quite an appropriate characterization of the present case.   *Lindeman* v. *Railroad Co.*, 42 Hun, 306.   In Maine the same rule has been adopted.   *Hooper* v. *Railroad Co.*, 81 Me. 260, 17 Atl Rep. 64; *State* v. *Railroad Co.*, 80 Me. 430, 15 Atl. Rep. 36.   In England an open gate is an intimation that it is safe for the traveler to pass.   *Wanless* v. *Railroad Co.*, L. R. 6 Q. B. 481; *Stapley* v. *Railroad Co.*, L. R. 1 Exch. 21.   It is, however, claimed that, even though such condition may authorize the person to rely, to a certain extent, upon such assurance, yet that it does not dispense with the exercise of his faculties, or relieve him from the obligation of looking and listening for the approach of danger, when by so doing he could avoid it.   The same objection was argued in the *Palmer Case*, *supra*, and the learned court then said in reply that, if the fact was proved that he did not look, coupled with the open gates, and the absence of signals, both of which are here present, it would not enable the court to say as matter of law that negligence was established.   112 N. Y. 243, 244, 19 N. E. Rep. 679–681.   In *Glushing* v. *Sharp*, 96 N. Y. 676, the testimony showed that the traveler looked about 30 feet from the railroad track, at a point where there was some obstruction; that he did not again look while passing the 30 feet, although by so doing he could have seen the train approaching; and it was held that whether he was negligent or not was a question for the jury. The court observed that "the raising of the gate was a substantial assurance to him of safety;   *   *   *   that any prudent man would not be influenced by it, is against all human experience;" and that such fact could not be ignored in measuring plaintiff's conduct.

Within these rules we think this recovery can be upheld.   The jury were authorized to find that the gates were raised at the time when the horse passed

them. It can safely be assumed that deceased had observed their condition, and it would hardly be required that he should keep his eyes upon them to see whether they would be lowered after he had passed. He was near the forward wheel of the wagon, walking upon the right side. It was his duty to exercise vigilance in protecting himself from danger from the west as from the east. From the east side of the wagon he could not see the track to the west, nor to the east until he passed the flag-shanty; while on the west side he would have a clear view of the tracks westward, and could observe. Negligence can scarcely be predicated, therefore, from the fact that he was on the opposite side from where danger did in fact come. If the gates were let down before his wagon passed entirely under them, it cannot be said as matter of law that he was negligent in not observing them. They were above him. They did not strike the horse. They could not strike him, as he was lower than the box of the wagon. It does not appear that the arms came in contact with the wagon-box, so as to attract his attention from that. It is said that the lowering of the arms sounded a gong, to which he should have given heed. If the arms did not entirely descend, it is impossible to say how many times the gong struck. There is no evidence as to how far the sound of it would reach. Deceased was beside his wagon, which must have made some noise, and he occupied a position where it would have the most effect upon him. Others say they did not hear it, but that does not prove that it was making no noise; on the contrary, it is opposed to reason that it did not make some, and all that it did make was immediately audible to his ear. Other noises were doubtless louder to the witnesses. It is said that the flagman shouted. That may well be, but it does not establish that deceased heard him, or that his failure to hear him was negligent. The whole transaction was the work of a few seconds of time. Deceased was between the gates. When the rear of his wagon was at the gates, his horse must have been upon the west-bound track, as the distance was but 17 feet, while his horse and wagon occupied 18 feet. He then had the assurance of safety, from the absence of the gateman and the raised gates. If upon the other side of his wagon, he could not have made an observation until within 19 feet of the west-bound track. He therefore continued upon the west side, where he could and did obtain a clear view of the track in that direction, and it is not strained to say that he relied upon the assurance of the gates as to the other side. If he listened,—and there is no certain evidence that he did not,—could he have heard the engine approaching, which gave no blast of whistle or sound of bell? If he looked, and saw the engine with the tender towards him, could he have told on the instant that it was approaching, and he must act instantly in order to save himself from injury? Should he stop, and go to his horse's head, and make an observation? This, as the evidence tends to show, would have brought him directly in the track of the engine, as he was then clear of the gates, while it would have given him but little assurance of safety when he had returned to his position and started again, if no train or engine was then there, as the circumstances might have changed. Should he drive fast or slow, turn or stand still? Who shall say? He was in a known place of danger, and was required to do something. That we can now see what he should have done and escaped injury does not aid us, as prudent persons do not always do what is shown to be the best thing to do from after-developments. All these considerations drive my mind to the conclusion that what he did do falls within the province of a jury to determine whether it be such an act as ordinary prudence would dictate under similar circumstances. It is further said that he looked ahead, and therefore must have seen the gates down upon the south side, which gave him notice of the approaching train. It was 88 feet across the tracks. The testimony shows that the gates on the south side were down as he entered upon the tracks. He may have thought that they would be raised, as the others were up as he crossed. This view

was held sufficient, in a similar case, to answer a charge of negligence, by the supreme court. *Haywood* v. *Railroad Co.*, 13 N. Y. Supp. 177.

Upon the whole case we think the question of deceased's contributory negligence was properly submitted to the jury. Both defendants claim to be relieved from any negligence which proximately caused the injury. We think the case was properly submitted to the jury as to each defendant. The claim of the Erie road is that negligence can only be predicated upon a failure to let down the gates in time to prevent deceased from going upon the track; that they in fact let down the gates at the point where their duty required them, in the progress of the engine upon the track, and that it was the negligent running of the engine, or the omission of signals, which in fact caused the injury. We do not think this contention is sustained by the evidence. The gateman on the southerly side, as before observed, had his gates down before or at about the time when the gates on the northerly side began to lower. He states that in the proper management of the gates he began to lower when the gates at the Seneca-Street crossing—some 310 feet easterly of Smith street—were lowered, as they gave him notice that trains were about to pass over. He also says that there was a better view from the northerly side. When the gates at Seneca street were lowered the trains must be some distance east of that street, and thus the distance to Smith street, over which the trains traveled, was materially increased. It is at once apparent that if, in the present case, the gates had been lowered when the engine was east of Seneca street, or when the gates on the southerly side were lowered, deceased could not have gone upon the track. Had that happened, no injury would have resulted. Thus such act became the proximate cause of the accident. Whether the gates were lowered at the usual and ordinary place occupied by the approaching engine, and whether such distance was a proper distance to insure safety to the road and public, we think, were questions of fact, and properly submitted to the jury. As to the Pennsylvania road, the proof is sufficient to warrant the jury in finding that no signals were given as the engine approached the crossing. *Greany* v. *Railroad Co.*, 101 N. Y. 419, 5 N. E. Rep. 425. The proof is overwhelming that the engine was run at a high rate of speed, and in violation of the ordinance of the city. The evidence also tends to establish that the engine continued to use steam up to the moment of striking the wagon; that, had there been a vigilant outlook by the persons in charge of the engine, the wagon could have been discovered in time to have stopped before coming in collision with it. This evidence warranted the court in submitting to the jury the question of negligence as to this defendant, and is sufficient to support the verdict thereon. We reach the conclusion, therefore, that the evidence shows the injury to have been produced by the concurrent negligence of both defendants, and that the verdict was properly rendered against both. *Chapman* v. *Railroad Co.*, 19 N. Y. 341; *Barrett* v. *Railroad Co.*, 45 N. Y. 628. Examination has been had of the exceptions taken upon the trial, and no error is found to the substantial prejudice of either defendant. We therefore arrive at the determination that the judgment and order appealed from should be affirmed as to both defendants, with costs.