## PARTRIDGE v. BOSTON & M. R. CO.

### MINARD v. SAME.

### BOSTON & M. R. CO. v. MINARD.

(Circuit Court of Appeals, First Circuit.    December, 13, 1910.)

Nos. 875, 882, 883.

1. APPEAL AND ERROR (§ 273*)—NECESSITY OF SPECIFIC EXCEPTIONS—INSTRUCTIONS.

A federal appellate court is not required to take notice of such a general exception as "to the charge of the court as far as the instructions given were inconsistent with the requests for rulings" or of a general exception to the court's refusal to give a number of requested instructions.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1621; Dec. Dig. § 273;* Trial, Cent. Dig. §§ 689, 694.]

2. RAILROADS (§ 324*)—ACCIDENTS AT CROSSINGS—CONTRIBUTORY NEGLIGENCE OF PERSON INJURED.

Plaintiff's intestate was driving a carriage, in which he was riding with a young lady, to whom he was engaged to be married, when the carriage was struck by a train on defendant's railroad on a country crossing, and he was killed. It was about 10 o'clock on a summer night and dark, although starlight. He was not familiar with the locality, and, although he knew there was a railroad in the vicinity, did not know the location of the crossing. Although the engine was running backward with no light in front except a lantern set on the top of the tender, the cars were lighted, and could have been seen from the highway for some 3,000 feet before the train reached the crossing. It appeared, however, that deceased was talking to his companion, and paying no attention to his driving, and did not see the train until the engine struck his carriage after the horse had passed over the plank crossing. Held, that he was chargeable with negligence, which precluded recovery for his death.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1022; Dec. Dig. § 324.*]

3. TRIAL (§ 89*)—RECEPTION OF EVIDENCE—DEPOSITIONS—MOTION TO STRIKE OUT ANSWER OF WITNESS—DISCRETION OF COURT.

Where the testimony of a plaintiff was taken by deposition, the refusal of the court on the trial to strike out a portion of one of her answers to a question on cross-examination which was not responsive, but was material to plaintiff's case, and which could not then have been supplied, held not reversible error.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 228–234; Dec. Dig. § 89.*]

4. RAILROADS (§ 350*)—ACCIDENTS AT CROSSINGS—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

The question of the contributory negligence of a plaintiff who was struck and injured by a train on a highway crossing of defendant's railroad while she was riding in a carriage with another, who was driving, held, under the evidence, properly submitted to the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1166; Dec. Dig. § 350.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. DAMAGES (§ 168*)—PERSONAL INJURY—ELEMENTS OF DAMAGES—MENTAL SUFFERING.

In an action by a young woman to recover for a severe personal injury, evidence was admissible on the question of damages to show that plaintiff's injuries were of such a character that childbearing would thereby be rendered dangerous to her life, and also to show that she had endured mental suffering on account of such fact.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 480–482; Dec. Dig. § 168.*]

In Error to the Circuit Court of the United States for the District of Massachusetts.

Actions at law by Warren G. Partridge, administrator, and by Alice B. Minard, against the Boston & Maine Railroad Company. Judgment for defendant in the first action, and plaintiff brings error. Affirmed. Judgment for plaintiff in the second action, and both parties bring error. Affirmed on defendant's writ. Reversed on plaintiff's writ.

George L. Mayberry (Warner, Warner & Stackpole, on the brief), for plaintiff in error.

Henry F. Hurlburt (Damon E. Hall, on the brief), for defendant in error.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. Three writs of error are here involved, and are grouped together by us as a matter of convenience for the reason that, in this case, the injury happened through a collision at a railroad crossing while the intestate, Phillips Payne Partridge, represented by the administrator of his estate, the plaintiff in error in No. 875, and Miss Alice B. Minard, the plaintiff in error in No. 882, and the defendant in error in No. 883, were riding together over the crossing, the injury occurring to both simultaneously, resulting in the death of Phillips Payne Partridge after a space of conscious suffering, and in a severe injury to Miss Minard. A verdict was rendered in favor of Miss Minard, against which the Boston & Maine Railroad sued out the writ of error in No. 883. During the course of the trial which resulted in that verdict, an exception was taken to the refusal of the court to allow certain evidence offered by the plaintiff on the issue of damages, which resulted in the writ of error sued out by Miss Minard in No. 882.

At the trial, the evidence for the plaintiff in these cases was practically the same. Especially is this the fact with reference to Miss Minard's testimony, which came in the form of a deposition taken for both cases. In Miss Minard's suit, the Boston & Maine Railroad put in a full defense, with several witnesses; but in the other suit a verdict was directed for the defendant at the close of plaintiff's testimony. Therefore the proofs are the same for each case so far as evidence was offered for the plaintiff, and that evidence may be considered in each, with comments only on some points as to its distinctive bearing on either proceeding. The evidence offered by the de-

fense in Miss Minard's suit cannot be used with reference to the writ of error arising out of Mr. Partridge's suit. These statements it is necessary to bear in mind, because, on one very important question which we will explain later, Miss Minard's evidence will be found to be inadmissible with regard to the Partridge suit, while admissible in her own behalf.

The leading facts, which we will state at the outset, are shown in the brief of the Boston & Maine Railroad as plaintiff in error in No. 883, substantially as follows:

"This is an action of tort brought by the plaintiff, now the defendant in error, but hereinafter referred to as the plaintiff, to recover damages for personal injuries alleged to have been received by her at Kennebunk, in the state of Maine, on the evening of August 15, 1907, by reason of the collision of a train of the defendant, now the plaintiff in error, but hereinafter referred to as the defendant, with a vehicle in which she was riding at a place in said Kennebunk known and hereinafter spoken of as Wormwood's Crossing, where a highway crossed at grade the railroad track of the defendant company. The accident occurred at 10 o'clock p. m. The wagon in which the plaintiff was riding was being driven at the time of the accident by one Phillips Payne Partridge, to whom the plaintiff was engaged to be married. The said Partridge received injuries at the time of the accident from which he died within a few hours, but Miss Minard survived, and her deposition which was read at the trial was the only evidence produced by the plaintiff of any eyewitness to the accident.

"The following facts appeared in evidence and were undisputed:

"The plaintiff, Miss Minard, was spending her first summer at Kennebunk Beach, where she arrived about July 1, 1907. Mr. Partridge was also spending the summer at the same beach with the Partridge family. He, however, had spent six weeks at the same beach in 1906 and the same length of time in 1905, and had been there for a couple of summers several years before 1905. In July, 1907, Partridge and Miss Minard met, and soon after became engaged.

"On the afternoon of August 15th, Partridge and Miss Minard took the train from Kennebunk Beach to Kennebunkport to attend a dinner party. In the evening, at about 8 o'clock, having learned that the great conflagration which practically wiped out Old Orchard was in progress, the plaintiff and Mr. Partridge left the dinner party and went together to a telephone booth, where Mr. Partridge called up a livery stable and engaged a team to drive to Old Orchard to witness the progress of the fire.

" 'X–Q. 72. You and he started for the common purpose of seeing the fire at Old Orchard? A. Yes, sir.'

"Miss Minard testified that she had never been over the highway from Kennebunkport to Old Orchard before. There was no evidence as to whether Mr. Partridge had been over this highway prior to the night of the accident or was acquainted with it or not, but the evidence did show that both of them—Miss Minard at least once and Mr. Partridge several times—had been by train over the highway where the accident occurred.

"Wormwood's Crossing, where the injury occurred, was the ordinary country crossing where a single-track railroad crossed the highway at grade. The highway ran from southeast to northwest, and was substantially straight for many hundred feet each side of the crossing. The team in which the plaintiff was riding approached the crossing from the southeast. The defendant's track ran substantially from northeast to southwest. The train which collided with the plaintiff was coming from the northeast, and the defendant's track, from the crossing, in the direction from which the train approached, was straight for nearly 3,000 feet. It will therefore be seen that as the plaintiff's team approached the crossing it was traveling on an angle towards the approaching train.

"It further appeared that at the crossing were the usual white fences and cattle guards on each side of the crossing, and that projecting over the highway on the southerly side of the crossing, and close to it, was the usual

warning post found at grade crossings, namely, a tall post, painted white, with a crossbar, and painted thereon in large black letters, 'Railroad Crossing,' with a supporting arm on which was painted in large letters 'Look Out for the Engine.'

"The accident occurred at just about 10 o'clock p. m. It was undisputed that it was a clear night; that is, there were no clouds in the sky. The witnesses described it as 'rather dark,' 'fairly dark,' and 'just a common starlight night without a moon.'

"The train which collided with the team in which the plaintiff was riding was scheduled to run regularly between Old Orchard and Portland. Old Orchard is on the Western Division of the Boston & Maine Railroad. This particular train left Portland for Old Orchard on the evening of the accident, and on each preceding day between 6 and 7 p. m., and arrived at Old Orchard at 7:23 p. m. It was due to leave Old Orchard for Portland again at 7:55 p. m.

"This train carried from Old Orchard to Portland each night three sleeping cars, one of which would be turned over at Portland to the Canadian Pacific Railroad and the other two to the Grand Trunk Railroad. These sleeping cars arrived in Old Orchard each morning and remained on a siding there throughout the day until they were picked up by the train for Portland in the evening. Inasmuch as there was no turntable at Old Orchard, the engine drawing this train customarily backed from Portland to Old Orchard, drawing a combination baggage and smoking car and an ordinary day coach behind it. In this way the engine was always headed towards Portland. At Old Orchard, the engine was shifted from the Old Orchard end of the train to the Portland end of the train, and what had been the Old Orchard end of the train would be connected to the three sleepers, so that, as the train was made up to go to Portland, there would first be the engine, a combination baggage and smoking car, a day coach, and then at the rear the three sleepers. The necessary switching was done and the train was made up on the night of the accident as on other nights, on the Boston side of the Old Orchard depot. Shortly before its departure for Portland the great fire at Old Orchard broke out—a fire which will be remembered as destroying a greater part of the summer settlement in Old Orchard, together with numerous hotels. Before the train could leave for Portland the fire had swept across the railroad tracks near the Boston & Maine station, which stood between the train and Portland, and warped and twisted the rails so that it was impossible for the train to go to Portland over its regular route.

"But there was another route to Portland. By running west from Old Orchard through Saco, Biddeford, West Biddeford, and Kennebunk to North Berwick over the Western Division, the train could get into Portland over the Eastern Division, which intersected the Western Division at North Berwick.

"The people at Old Orchard were in a panic by reason of the conflagration, and they threw what belongings they could save into the baggage car in paper bundles, sheets and every other way they could get them aboard the train. As before stated, there was no turntable at Old Orchard, and therefore all that could be done when the fire blocked the way over the usual route was to shift the engine, still headed towards Portland, from the eastern or Portland end of the train to the western or Old Orchard end of the train. This was done, with the result that the tender of the engine became the head end of the train; and the sleeping cars, which as the train was ordinarily made up had composed the rear part of the train, became the forward part of the train and were next the engine.

"Either on the trip from Portland to Old Orchard or while at Old Orchard, what was known as the 'tail light' on the engine—that is to say, a light similar to the headlight and consisting of a lamp with a reflector behind it inclosed in a wooden or metal case with a glass front and mounted upon the extreme end of the tender—caught fire and was rendered useless. No other tail light or headlight was procurable nearer than Portland, and, as a precautionary measure, an ordinary brakeman's lantern was placed upon the inverted manhole cover in the center of the rear part of the tender, and pieces of coal were placed along its base in order to keep the lantern in place. The lantern was so placed that no part of its light was obscured by the tender

or the coal or by any part of the manhole cover. The manhole referred to, upon which the lantern was placed, sticks up several inches above the flange or flaring part of the top of the tender. The light was therefore plainly visible, and not obscured in any way. Moreover, the headlight of the engine —that is, the regular headlight upon the Portland end of the engine—was lighted and shown upon the end of the Pullman coach next the engine. All of the Pullman sleepers were brightly lighted with Pintsch gaslights or acetylene gas. None of the berths in these Pullman sleepers had been made up at the time of the accident, and the curtains at the windows had not been lowered. Moreover, all of the Pullmans had monitor tops through which the light shone. The day coach and the combination smoking and baggage car were lighted with kerosene lamps. These cars also had monitor tops. It was not disputed that all of these lights in the train, together with the lantern upon the tender and the headlight of the engine, were burning brightly from the time the train left Old Orchard until and after the accident occurred.

"Thus made up and equipped the train left Old Orchard for Portland·by way of North Berwick at 9:20 p. m. The distance from Old Orchard to Wormwood's Crossing was 11 miles. The first stop the train made after leaving Old Orchard was at Saco. This stop was only momentary. The next stop was across the river at Biddeford. At Biddeford there was a turntable, but it was impracticable, if not impossible, to turn the engine there that night. It was estimated by witnesses that a crowd of as many as 10,000 people, which had been attracted by the conflagration at Old Orchard, thronged the station platforms and tracks at Biddeford. The crowd at Biddeford overran the tracks. They thought that the train was going back to Old Orchard, and they were anxious to get there to see the fire, and they accordingly clambered onto the engine and train and into the cab, and they were so densely crowded along the track that it was with difficulty that the train was run through the station. In order to have turned the engine on the turntable at Biddeford, it would have been necessary to run the engine back and forth through the crowd several times and to shift other engines which occupied the tracks leading to the turntable. It was therefore deemed unsafe and inexpedient to turn the engine there, and it was the only place at which it could have been turned.

"The train stopped at Biddeford five or six minutes before it was able to proceed. Its next and last stop before arriving at Wormwood's Crossing was at West Biddeford, where it stopped for about a minute."

The plaintiffs claimed that the train was run at an unusual speed, and that no bell nor whistle was sounded as Wormwood Crossing was approached. There was evidence on both sides of these propositions, which we need not refer to further than we have spoken of them later in this opinion.

In the Minard suit, the Boston & Maine Railroad passed the court 53 requests for instructions. Four of them seem to have been withdrawn. With reference to these requests, the bill of exceptions states at one point, near the close, as follows:

"The defendant excepted to the charge of the court as far as the instructions given were inconsistent with the requests for rulings."

It is settled in the federal courts that the court is not required to take notice of this form of exception. It is impossible for the court to go through and analyze the instructions given, and arrange them with the requests for rulings in parallel columns; that is a burden which every court which has regard for the successful result of its labor refuses to undertake.

At another place in the bill of exceptions it is said, "The court declined to give the following rulings requested by the defendant," and

then are given the numbers of sundry requests. The record continues: "And the defendant duly and seasonably excepted to such refusal." This is also under the settled practice of the federal courts a useless form of exception. This practice is particularly applicable here, because the blank which we have left in giving this extract covers all the requests except 9, 24, 25, 44, and 48. The result is that we have here 47 requests, covering nearly 8 printed pages of the record, passed up in one bunch, and ruled out in one bunch. Of course, it was impracticable for the trial court to deal intelligently with the requests so submitted, and for this court to deal intelligently with a mass of requests thus offered and ruled out, without vastly more labor of a mechanical and clerical kind than we ought to consent to burden ourselves with. Parties desiring the views of an appellate tribunal must find some way to bring out their propositions in such form as to enable it to understand them in a pointed manner; otherwise the appellate tribunal may fall into errors which it cannot avoid and which cannot properly be charged against it. We shall therefore only endeavor to dispose of such leading propositions as it is apparent to us the case involves, or which a court may fairly be required to consider no matter how inartificially the same are brought to its attention. We are, however, satisfied that we shall reach a correct result in the Partridge Case, and that, so far as we go, we shall reach a correct result as to the main propositions in the Minard Case, leaving the trial court unfettered as to minor propositions, which may either be corrected on new trial or left in a position to be apprehended on appeal without too much labor.

As to the charge of negligence on the part of the Boston & Maine Railroad, so far as the matter has been called clearly to our attention, we are satisfied with the propositions of law propounded by the learned trial judge. Under the circumstances of the conflagration at Old Orchard, which it may well be said were notorious, we are unable to perceive that the corporation is chargeable with negligence merely for the manner in which it was running its trains, except it be for the fact that, in view of the peculiar conditions of moving backward, it was perhaps chargeable with special caution as to speed at crossings. The evidence on the question whether or not its whistle and bell were sounded, was the ordinary kind found in these cases where negative proofs are ordinarily accepted by juries as sufficient to overcome the just presumption arising out of the fact that ringing bells and blowing whistles at crossings has ordinarily become a matter of habit with the locomotive engineers and firemen. The negative evidence was weak on this point as against the cumulative proofs furnished by the defendant corporation in Miss Minard's suit, and so weak that, if the ruling of the trial judge had been a direction to the jury in favor of the defendant corporation in regard thereto in her suit, we probably would have sustained it. On the other hand, as the testimony was that of several witnesses pro and con on a question of this character under somewhat peculiar circumstances, the presumption in favor of the correctness of the action of the trial judge in submitting the question to the jury is too strong to justify our interference. Therefore, so far

as that is concerned, we cannot disturb the verdict in favor of Miss Minard.

So far as the Partridge suit is concerned, we are satisfied that the ruling of the court directing a judgment in favor of the corporation, which direction, no doubt was in view of the entire lack of care on the part of Partridge, the deceased, was correct. The question is not one of stopping, looking, and listening. This crossing was in the country, and the circumstances as stated by the corporation itself were not such as rested a burden on the deceased, charging him with looking out for this particular crossing, and therefore charging him with the duty of stopping, looking and listening. Partridge was only a summer visitor at a point several miles away from the crossing; and the most that could be presumed with reference to him was what Miss Minard testified as to herself, namely, that she knew that there was one railroad in that neighborhood, but did not know specifically where it was.

Miss Minard and Mr. Partridge had been riding for about two hours as shown, without any evidence in the record that they were at all familiar even with the road on which they were traveling. She testified that Partridge was sitting at her right, and they were talking together. So far as appears, the conversation was such as might have ordinarily been expected under the circumstances. They were talking when a "dark object loomed up." This "dark object" was the locomotive, and was the first thing that attracted her attention either by sight or sound. The horse had been walking, and they had been "talking together right along for a mile or two before this dark object loomed up." Her whole testimony leaves the unquestioned impression that neither of them had been giving any attention whatever to their movements so far as driving was concerned. Although the night was a starlight night, she on the whole leaves the impression that at any rate it was a dark night. Of course, the darker the night, the greater the necessity for giving some attention to the movements of the carriage. The crucial fact we may say is that, although the crossing had the usual planking, Partridge could not have noticed the sound of the horse's feet on it; and yet the horse entirely crossed the track and was uninjured, while the locomotive struck the carriage squarely on the end of the seat in which the young lady and the young man were without being before noticed by him. This proves beyond doubt an absorption on the part of these two people which shut out from their attention everything except themselves. The question, therefore, is not one of stopping, looking, and listening, but whether persons driving on a country road in the neighborhood of very considerable towns, on what is described by one of them as a dark night, are to be regarded as using reasonable care when no attention whatever is given to the surrounding circumstances or to the progress of the carriage.

This train consisted of five lighted passenger cars, traveling on a tangent of at least 3,000 feet toward this crossing, upon an elevation above the surrounding country, which for the most part was free from obstructions; and it is impossible to conceive that any persons who were giving any attention whatever to their surroundings would not

have had visual information of its approach, independently of any questions of the method in which the locomotive was being run, of its speed, or of bells or whistles. Therefore, while there was no special negligence in regard to the matter of stopping, looking, and listening, there was general negligence with which the driver of the team was chargeable with reference to anything with which he might come into collision. The man is singularly unfortunate whose experience does not teach him how absorbed in each other these young people must have been; but that absorption cannot create a cause of action where otherwise none would exist. There was the same general negligence which was fatal to the plaintiff's recovery in Whitman v. Lewiston, 97 Me. 519, 521, 55 Atl. 414, and in Whitman v. Fisher, 98 Me. 575, 578, 57 Atl. 895. Therefore in the Partridge Case we are clearly of the opinion that we cannot reverse the judgment of the Circuit Court, whatever disposition might be made of any minor propositions coming from the plaintiff in error.

Returning now to the case in behalf of Miss Minard, we first draw attention to a cross-question put to her in her deposition, to which we have referred, and also to her answer to the same, and to the ruling of the court in reference thereto:

"X–Q. 151. Did you see Mr. Partridge looking for the approach of any train just before the accident—previous to the time of the collision? A. I cannot say that he looked for the approach of a train previous to this time. He was watching out for the approach of any object, I am sure, from his general driving; from the way he drove.

"[At the time of the taking of the deposition the defendant requested that all of the answer after the word 'train' be stricken out on the ground that the remainder of it was not responsive, was an expression of opinion, and was incompetent. This request was again made when the deposition was read at the trial. The court declined to strike out the portion of the answer requested, but allowed it to be read to the jury, and the defendant duly excepted.]"

The record shows that the defendant corporation raised an objection at the time the deposition was taken, and also followed it up at the trial in the manner required by the practice of the Federal courts. Undoubtedly, if the witness had been on the stand, the court would have stricken out the concluding sentence of her answer according to the corporation's request. Nevertheless the question of striking out evidence that is not responsive to a question is for the trial court, and it does not amount to a reversible error unless it is of a more obnoxious character than anything found here. It could not be stricken out, of course, by the examiner under the decisions of the Supreme Court: and, if stricken out at the trial, Miss Minard would have been left without a very important factor in her case. This was one of the unfortunate risks often taken by cross-examiners.

Much discussion is made to us with reference to the relative responsibility of Miss Minard for the negligence of Partridge. We do not regard it as necessary to go through all the propositions pro and con on this point; and, for the reason we have already stated as to the way in which the record is made up, it is impracticable for us to do so. The charge of the learned circuit judge in regard thereto is in all substantial matters correct. If it was lacking in any particulars, they

were minor particulars, and the attention of the trial court should have been called to them specifically; and, likewise, our attention should be called to them in a pointed manner, so that we might appreciate the criticisms without difficulty. The instructions we refer to were as follows:

"But suppose you do find that the defendant was negligent—and you will understand that in making that suggestion I am not suggesting that you will find that the defendant was negligent, but that I have got to review all the circumstances of the case in every possible aspect—suppose you find the defendant was negligent, you will then consider whether the plaintiff, Miss Minard, was also negligent. The law says that when an accident is caused by the acts of negligence of two people, the defendant and the plaintiff, the plaintiff cannot recover; but the law also says that, where the defendant is supposed to be negligent and the plaintiff is charged with negligence also, the burden of proof to show the plaintiff's contributory negligence is upon the defendant. So that the burden of proof on this issue is upon the defendant, and not upon the plaintiff. So it is for you to determine whether Miss Minard lacked ordinary prudence in what she did. Has the defendant satisfied you upon that point? Did she act like an ordinary prudent woman under the circumstances in which she was situated? I held, as you have learned, that Mr. Partridge did lack that prudence, that he was careless, the evidence shows it plainly, and that he cannot recover on that account, that his estate cannot recover on that account. But Miss Minard's situation was different from that of Mr. Partridge. Mr. Partridge was driving the team along the road with all the responsibility which driving a horse implies. Miss Minard was not driving the horse. She was riding with him. The horse was not in her control. You have heard what the situation of the parties was, that the horse was hired. You have heard the relations of Mr. Partridge and Miss Minard, and it is for you to determine whether in what she did not do she failed to use ordinary care, the ordinary care of a young woman in her place. The care of a woman riding in that way with a man is not the kind of care or the degree of care which is expected from a man who is actually holding the reins of a horse. I am not stating to you, gentlemen, any recondite principle which requires one to read the books in order to find out, but you yourselves know that when a man is driving a horse, and a woman is sitting beside him, the first responsibility for driving that horse rests upon the man, the man who is guiding the horse; and you also know that a woman is not expected ordinarily to shut her eyes and do nothing. She also in her degree must not be careless. She also in her degree must act like a prudent person, and you are to determine whether, under all the circumstances of this case, Miss Minard did act like a prudent person. The burden of the proof is on the defendant, who seeks to show you that she did not. There was a case in Massachusetts, the facts were somewhat different, but the rule laid down is applicable to this case, and I shall read to you substantially the language of the court:

" 'The result is that the plaintiff (that is, Miss Minard) would not be entitled to recover, if, in the exercise of common prudence, she ought to have given some warning to the driver of carelessness on his part, which she observed or might have observed in exercising due care for her own safety, nor if she negligently abandoned the exercise of her own faculties and trusted entirely to the vigilance and care of the driver. She cannot hide behind the fact that another is driving the vehicle in which she is riding, and thus relieve herself of her own negligence. What degree of care she should have exercised, in accepting the invitation to ride, or in observing and calling to the attention of the driver perils unnoticed by him, depends upon the circumstances at the time of the injury. On the other hand, she would be permitted to recover if, in entering and continuing in the conveyance, she acted with reasonable caution and had no ground to suspect incompetency and no cause to anticipate negligence on the part of the driver, and if the impending danger, although in part produced by the driver, was so sudden or of such a character as not to permit or require her to do any act for her own pro-

tection.' Shultz v. Old Colony Street Railway, 193 Mass. 323 [79 N. E. 878, 8 L. R. A. (N. S.) 597, 118 Am. St. Rep. 502].

"I think, gentlemen, that makes the issue plain. The question, in other words, is not whether Miss Minard would have been guilty of contributory negligence if she had been driving the horse, but whether in doing as she did, or in refraining from doing things which she refrained from doing, Miss Minard acted like a prudent woman under her circumstances. The burden of proof is upon the defendant. If, upon the whole, the defendant has satisfied you that she did not, then she cannot recover. If, upon the whole, the defendant has not satisfied you that Miss Minard was negligent, then on that issue you will find for the plaintiff."

In view of these instructions, the fact as to which Miss Minard testified as to "general driving," "the way he drove," was of importance. If she in her association with him, which had been intimate, had observed that he was one whose driving was such that it would show that he was "watching out for the approach of any object," this was an important fact with reference to the degree of responsibility which she was under as shown by the learned judge in our extracts from his charge.

We think the law is correctly stated in the following decisions. We refer first to State v. Boston & Maine Railroad, 80 Me. 430, 446, 15 Atl. 36. Here Thorogood v. Bryan, 8 C. B. 115, was disapproved; and it was also in Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, 29 L. Ed. 652. In the latter case it was disapproved only in certain particulars, the case calling for nothing more. State v. Boston & Maine Railroad disapproved Thorogood v. Bryan as applied to members of a party who had been journeying on a pleasure excursion in an open team, except as against the one who owned the team and was driving it. This, to be sure, was a mere dictum; but it is accepted as the law of Maine. Whitman v. Lewiston, 97 Me. 519, 55 Atl. 414, Whitman v. Fisher, 98 Me. 575, 578, 57 Atl. 895, Denis v. Railway Company, 104 Me. 39, 48, 70 Atl. 1047, Pyle v. Clark (decided by the Circuit Court of Appeals for the Eighth Circuit in March, 1897) 79 Fed. 744, 748, 25 C. C. A. 190, and Davis v. Ry. Co. (decided by the Circuit Court of Appeals for the Eighth Circuit in 1907) 159 Fed. 10, 18, 19, 88 C. C. A. 488, 16 L. R. A. (N. S.) 424, with the qualifications and limitations which they contain, fully sustain generally the rulings of the Circuit Court which we have quoted on this point. Therefore we repeat that, if these rulings, which were generally correct, were deficient in any detail, that should have been seasonably called to the attention of the learned judge of the Circuit Court, and pointedly brought out again before us. Therefore, on the whole, we are not able to say that the court should have withdrawn Miss Minard's case from the jury as asked by the Boston & Maine Railroad on its writ of error.

This leaves only the writ of error of Miss Minard against that corporation. So far as that is concerned, the only complaint is based on the following alleged errors:

"1. That the court erred in ruling that it would not be competent evidence for the plaintiff to show that 'the plaintiff's injuries were of such a character that childbearing would be thereby rendered perilous to life,' and in refusing to admit such evidence.

"2. That the court erred in ruling that it would not be competent evidence in behalf of the plaintiff 'that, because of the contraction of the area

of the pelvic opening occasioned by the accident, it would be impossible for the plaintiff to give birth to a child of normal size in a natural way. That, if the plaintiff should ever become pregnant, it would be necessary either to bring about a premature birth, or to remove the child by a Cæsarian section through the abdomen. That both of these remedies involve danger to the health and life of the plaintiff,' and in refusing to admit such evidence.

"3. That the court erred in ruling that it would not be competent for the plaintiff to prove 'that by reason of the injuries to the pelvis occasioned to the plaintiff as the result of the accident the capacity of the plaintiff to perform the functions of a woman in regard to childbearing has been seriously impaired, and the performance of such functions has been rendered dangerous to her health and life,' and in refusing to admit such evidence.

"4. That the court erred in ruling that it would not be competent for the plaintiff to show 'that the plaintiff has endured much mental suffering because of her condition in respect to her ability to bear children,' and in refusing to admit such evidence."

It is often said that mere mental suffering does not support a claim for damages; but mental suffering in connection with physical suffering stands on a different footing. The evidence offered on the other point related to a clearly physical condition which was alleged to be the immediate result of the injury for which the suit was brought. This was a physical fact of a character which usually and properly goes to the jury as bearing on the question of damages, existing or reasonably probable in the future; and we think it should have been admitted.

In No. 875, Partridge, Administrator, v. Boston & Maine Railroad, the judgment of the Circuit Court is affirmed; and the appellee recovers its costs of appeal.

In No. 883, Boston & Maine Railroad v. Minard, and in No. 882, Minard v. Boston & Maine Railroad, in each the judgment of the Circuit Court and the verdict therein are set aside, and the case is remanded to that court for further proceedings in accordance with law; and Miss Minard recovers one bill of costs of appeal.

ALDRICH, District Judge (concurring). On the whole I concur in the results reached in the foregoing opinion, but with a great deal of hesitancy in the particular result which turns the Partridge Case decisively against the administrator, upon the ground of the contributory negligence of his intestate; and I desire to state the reasons for my conclusion.

At the arguments I was impressed with the strength of the plaintiff's position based upon the fact that the engine, which was hauling a train of Pullman cars, was running at a high rate of speed, with the tender forward, with no headlight but a lantern on the tender.

The plaintiff says, though the general rule in Maine is that the defendant's negligence is no excuse or justification for the plaintiff's negligence, that such rule is subject to the qualification that, if the negligence of the defendant is of such a kind as to deceive and lead the injured party into a field of danger, then the defendant's negligence becomes something to be considered upon the question of the injured party's care. This position apparently finds some support in the Maine case (State v. B. & M. R. R. Co., 80 Me. 430, 443, 15 Atl. 36), where it is said in effect that, if a party sees a gate open at a crossing, he

may place some reliance on the supposition that there would be no danger in attempting to cross; but the position finds more considerable support in the case of Baltimore & Potomac R. R. v. Cumberland, 176 U. S. 232, 237, 20 Sup. Ct. 380, 382 (44 L. Ed. 447), a case in which the engine was running tender forward with no headlight, but a lantern, and where the Supreme Court said, referring to the lantern:

"The light was clearly not an ordinary headlight, * * * shedding a dazzling light which could scarcely fail to be noticed by a person crossing in front of an engine, but an ordinary lantern which might readily be mistaken for a lantern carried by a foot passenger, or even a street lamp, or other smaller light."

The plaintiff's position as to the qualification upon the general rule that the defendant's negligence may be considered upon the question of the plaintiff's negligence, if it is of a nature to mislead or deceive a traveler into a position of danger, is, doubtless true as a legal proposition, and it therefore results that the plaintiff's rights do not turn upon any question of law, but upon the question whether the defendant's negligence deceived the plaintiff, or whether there was any substantial evidence, viewing the circumstances as they are explained, and making all reasonable inferences in favor of the plaintiff, which would entitle him to go to the jury upon the question of fact thus presented. In other words, this being a case where the defendant was negligent, and where the plaintiff's intestate apparently, without seeing or hearing, rode into the situation of danger, is there anything substantial tending to show that the traveler, while in the exercise of ordinary care, was misled; or was it a case where he was so clearly lacking in care and attention, in respect to the hazards of driving in the nighttime in the vicinity of railroads and other dangerous agencies, that there is nothing substantial upon which the plaintiff could go to the jury?

If the intestate was misled at all, it was through not seeing rather than seeing.

In the case of the open gate, to which reference has been made (State v. B. & M. R. R. Co., 80 Me. 430, 443, 15 Atl. 36), the injured parties saw the gate open, and the fact of the open gate was what misled them. That, I think, distinguishes the Maine case from the case at bar, because there is no evidence in this case tending to show that the injured party was misled by anything that he saw.

The reasoning of the Supreme Court with respect to the absence of a headlight is nearer to the situation here than cases based upon conditions which were seen and which misled.

The story of the intestate's misfortune, so far as it is told and so far as it can be known, making all natural inferences, on the whole would seem to justify the conclusion that he was wholly unmindful of the responsibilities resting upon a driver in the nighttime in a thickly settled locality, where it must have been well known to him that he was in the neighborhood of railroads, automobiles, and other dangerous agencies.

This apparently is not a case to be influenced at all by any considerations in respect to the look and listen rule, because there is nothing

to show that he had any actual knowledge that he was at a railway crossing; but it is a case where the result, unfavorable to the injured party, is reached upon the theory that the driver was altogether thoughtless of dangers and unmindful of the responsibilities which rest upon highway travelers in the nighttime.

He had been two hours making four miles. The steady old horse was apparently going at its own pace. The night was still and clear, but rather dark; and, without knowing it, the intestate, with his companion, was approaching the railroad track at nearly right angles. After they passed the Towne house, which was on the right of the highway, and something like 8 or 10 rods from the railroad, if he had been on the lookout ahead and to the right and left, he would have discovered the train, because there was a long stretch of straight open track, which was higher than the highway upon which the intestate was traveling, with nothing to obstruct the view.

When it comes to distinguishing the reasoning of the headlight case, to which I have referred, where it is said that a dazzling light could scarcely fail to be noticed by a person crossing the track, from reasoning which should apply to the case at bar, I must say that the task is not free from difficulty; still there is nothing in the testimony of Miss Minard, nor is there anything in the circumstances, which indicates that the train was discovered at all or that the light, which was a lantern instead of a headlight, misled the driver, and therefore, if the case is turned for the plaintiff upon the lack of a headlight, it must be upon the theory that, while the lantern did not mislead, the presence of a headlight would have commanded attention; and that would be a theory in the field of conjecture.

It is well known that in the nighttime many of the ordinary distracting sounds of daytime are absent, and that on country roads the stillness of night prevails. It is conceded that the signpost projecting over the highway, the white fences and the cattle guards, and such other things as usually exist at railway crossings, were not seen, and that the rapidly approaching train, on elevated ground, with combination smoker and baggage car, a day coach, and three sleepers, all lighted, was neither seen nor heard. Thus the indicated condition of personal absorption and thoughtlessness would, on the whole, seem to fairly justify an assumption that what would have been the effect of the presence of a proper headlight, under all the circumstances, is something conjectural.

I think the case one very near the line, and one not free from difficulty, but, on the whole, I concur in the conclusion that the plaintiff's intestate was not giving proper attention to the hazard of night driving, and that he was so wholly indifferent to surrounding dangers that the plaintiff is not in a position to be relieved from the doctrine of contributory negligence on the ground that the defendant's negligence deceived the intestate into the injury complained of.